# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>JAYSON D. EDWARDS, JR.<br><br>　　　　　　　　　　Defendant. | Case No. 11-CR-138-JPS<br><br><br><br>ORDER |

　　　　On June 28, 2011, a grand jury sitting in this district returned a single count indictment charging the defendant, Jayson D. Edwards, Jr. ("Edwards"), with possession of a firearm having been previously been convicted of a crime punishable by a term of imprisonment exceeding one year– a felony, all in violation of 18 U.S.C. §§ 922(g)(1), 924(e)(1) (Docket #1, ¶¶ 1–2). Following Edwards' arrest on a drug related charge, City of Hartford police officers located two guns hidden in the ceiling of a commercial building Edwards had rented. (Docket #22, 5; Docket #23, 2). As a result of Edwards' prior felony record and apparent possession of a firearm, the government brought this case against him. (Docket #1, ¶¶ 1–3).

　　　　Following arraignment, Edwards filed a motion to suppress the guns and other incriminating statements as evidence against him. (Docket #16). Magistrate Judge William Callahan conducted an evidentiary hearing on the motion, after which the parties submitted briefs. (Docket #21-24). Ultimately, Magistrate Callahan recommended that this Court deny Edwards' motion, thus allowing the guns and incriminating statements to be used as evidence against Edwards. (Docket #25).

Edwards has objected to Magistrate Callahan's Recommendation, and the Court now considers the motion *de novo*. (Docket #26); 28 U.S.C. § 636(b)(1)(c).

1. BACKGROUND

    1.1 Factual Background: Arrest and Discovery of Evidence

In early February of 2011, City of Hartford police officers began investigating a series of burglaries of downtown Hartford businesses. (Tr. 5–7; Docket #22, 2; Docket #23, n. 1). In late January and early February of 2011, there had been more than a dozen burglaries in the area, including a burglary of a gun store that resulted in the theft of several firearms. (Tr. 6; Docket #22, 2; Docket #23, n. 1).

On either February 8 or February 9, 2011, Hartford police held a departmental briefing addressing this series of burglaries. (Tr. 5–7; Docket #22, 2). At this briefing, the police identified Jayson Edwards and Steven Shaw as suspects. (Tr. 7; Docket #22, 2; Mag. Rec. 2). The officers in attendance were shown a picture of Edwards, and were told that he was wanted on an outstanding paternity warrant. (Tr. 7; Docket #22, 2; Mag. Rec. 2). More importantly, the officers established that Edwards "possibly" rented a building located at 211 North Main Street in Hartford, in which he planned to open a tattoo parlor. (Tr. 14; Docket #22, 2; Mag. Rec. 2).

Later that week, on February 10, 2011, an informant told City of Hartford police officers that Shaw was in Hartford, selling cocaine and driving a white van with brown stripes. (Tr. 8–9; Docket #22, 2; Docket #23, 1). Officer Dorn then saw this van in the parking lot of a commercial building at 211 North Main Street. (Tr. 10; Docket #22, 2; Docket #23, 1).

Suspicious, Dorn went to examine the building. Dorn noticed that the building appeared vacant, with most of its windows covered, but that several

of the interior lights were on and loud music was playing inside. (Tr. 11–13; Docket #22, 2; Mag. Rec. 2).

Dorn called for backup, and two more officers, Decker and Kirk, quickly arrived at the scene. (Tr. 13–15; Docket #22, 2; Docket #23, 1; Mag. Rec. 2). The three officers separated, and each stationed himself near one of the building's three exits. (Tr. 15; Docket #22, 2; Mag. Rec. 2). Dorn approached the side entrance and observed a person exit the building, see the officer, and run back inside. (Tr. 16; Docket #22, 2; Docket #23, 1; Mag. Rec. 2–3). Immediately afterwards, the lights and music were turned off inside the building. (Tr. 16; Docket #22, 2; Mag. Rec. 3).

Dorn believed that the person who had exited and re-entered the building resembled the picture of Edwards that he had seen during the briefing earlier in the week. (Tr. 16; Docket #22, 3; Docket #23, 1; Mag. Rec. 3).

Thus, Dorn called his supervisor, Sergeant Zywicki, to inform him of the situation and request assistance. (Tr. 16, 64–65; Docket #22, 3; Mag. Rec. 3). Zywicki immediately walked to the scene, a short distance from the Hartford police station. (Tr. 16; Docket #22, 3; Mag. Rec. 3).

Next, Dorn contacted the police dispatcher. (Tr. 18; Docket #22, 3; Mag. Rec. 3). Dorn requested backup, and also verified that Edwards had an active child support warrant. (Tr. 16, 18–19; Docket #22, 3; Docket #23, 1; Mag. Rec. 3). Finally, Dorn asked the dispatcher to attempt to contact any keyholders of the building at 211 North Main Street. (Tr. 18–19; Docket #22, 3; Docket # 23, 1; Mag. Rec. 3).

Police were unable to contact any of the keyholders. (Tr. 18–19, 82–83; Docket #22, 3; Docket #23, 1; Mag. Rec. 3). Interestingly, they made no attempt to contact Edwards, who—as a legal occupant, renting the

building—was a keyholder. (Tr. 83–84; Docket #22, 3; Docket #23, 1; Mag. Rec. 3). Dorn and Zywicki did not suggest that the dispatcher contact Edwards, despite the fact that Dorn was told during the earlier briefing that Edwards rented the building in question. (Tr. 46–47, 83–84; Docket #22, 3; Docket #23, 1; Mag. Rec. 3).

It is also important that at no time did the police seek to obtain a search warrant for the building. (Tr. 94–95; Docket #22, 3; Docket #23, 1; Mag. Rec. 3). Though it is unclear exactly how much time passed after Dorn's observation of the person exiting and reentering the building, it is clear that enough time had passed for Dorn to request backup, wait for backup to arrive, and for calls to be made to building keyholders. (Tr. 48 (indicating seventeen minutes), *but see* Tr. 84–85 (indicating a time anywhere between twenty and forty minutes); Docket #22, 3; Docket #23, 1; Mag. Rec. 3). In that time, during which the dispatcher was presumably calling keyholders, the police did not attempt to secure a search warrant. (Tr. 94–95; Docket #22, 3–4; Docket #23, 1; Mag. Rec. 3).

Finally, after backup had arrived at the scene, Zywicki instructed Dorn to break the window of the side door from which the man resembling Edwards had emerged, and then to unlock that door and to enter the building. (Tr. 49–50; Docket #22, 3; Docket #23, 1; Mag. Rec. 3). Dorn did so and entered the building, but exited after officers stationed outside the building informed him that the building's occupants were moving toward him and the side door that he had just entered. (Tr. 49–52, 65; Docket #22, 3; Docket #23, 1; Mag. Rec. 3). After Dorn exited the building, the police officers demanded that the occupants come outside. (Tr. Tr.52, 66; Docket #22, 3; Docket #23, 1; Mag. Rec. 3). Four individuals, including Edwards and Shaw,

exited the building and were taken into custody. (Tr. 66; Docket #22, 3; Docket #23, 1; Mag. Rec. 3–4).

Having taken the four men into custody, the officers conducted a protective sweep of the building, during which they found drug paraphernalia in plain view on a desk. (Tr. 67–68; Docket #22, 3, 4–5; Docket #23, 2; Mag. Rec. 4).

After approximately twenty to twenty-five minutes, during which Edwards had been outside,[1] the officers brought him back into the building. (Tr. 104–06; Docket #22, 5; Docket #23, 2; Mag. Rec. 4). Inside, the officers questioned Edwards without providing a *Miranda* warning. (Tr. 92–93; Docket #22, 5). Zywicki spoke to Edwards about multiple topics, including why Edwards re-entered the building after seeing a police officer and Edwards' intent to open a tattoo parlor in the building. (Tr. 69–72, 92–94; Docket #22, 5; Docket #23, 2; Mag. Rec. 4).

Zywicki then discussed Edwards' ability to post cash bail, and asked whether anything needed to be turned off in the building. (Tr. 69–72; Docket #22, 5; Mag. Rec. 4). Edwards responded that his tattoo gun needed to be turned off. (Tr. 71; Docket #22, 5). Their discussion was "conversational." (Tr. 70).

Zywicki turned off the tattoo gun, then returned and asked whether there was "anything else" the police "should know about." (Tr. 71–72; Docket #22, 5; Docket #23, 2; Mag. Rec. 4). Edwards responded "no"; Zywicki then asked whether the police could "look around" or "check it out," but never specifically requested to "search" the building. (Tr. 71–73; Docket #22, 5;

---

[1]Edwards had been outside, in cold weather, because he refused to be placed in a police cruiser. Edwards refused because he believed he was suffering from the onset of a panic attack. (Docket #22, 6).

Docket #23, 2; Mag. Rec. 4). Edwards responded "yes," that they could. (Tr. 71–73, 113; Docket #22, 5; Docket #23, 2; Mag. Rec. 4). Later, at the magistrate's hearing on this issue, Edwards testified that he thought the officers would merely search for drugs on the countertops. (Tr. 112; Mag. Rec. 4). After Edwards consented to the officers "looking around," the officers seated him in the main room of the building and proceeded with their search of the building. (Tr. 23–27; Docket #22, 7; Docket #23, 2; Mag. Rec. 4–5).

During this search, Dorn lifted several ceiling panels and found two guns. (Tr. 23–27; Docket #22, 7; Docket #23, 2; Mag. Rec. 5).

Edwards now seeks to suppress those guns as the result of an illegal search under the Fourth Amendment. (Docket #22).

1.2     Procedural History

Jayson Edwards was indicted on June 28, 2011, and detained pending trial. (Docket #1, 10). After receiving several extensions of time, Edwards filed a motion to suppress the admission of the guns and several incriminating statements he made after the officers found the guns. (Docket #11, 15, 16).

Magistrate Callahan held a hearing on Edwards' Motion to Suppress. (Docket #21). Officer Dorn and Sergeant Zywicki both testified at this hearing, as did Edwards. (Docket #21). The parties then filed letter briefs with Magistrate Callahan. (Docket #22, 23, 24).

Considering the testimony presented at the hearing and the parties' arguments, Magistrate Callahan recommended that this Court deny Edwards' Motion to Suppress.

Edwards objected to the magistrate's recommendation, and filed his objections with this Court, asking that the Court suppress the guns and statements as evidence for use at trial. (Docket #26).

The Court now considers the arguments of both parties in determining whether Edwards' Motion to Suppress should be granted.

2. STANDARD OF REVIEW

This Court is obliged to review the recommendations of the magistrate *de novo.* 28 U.S.C. § 636(b)(1)(C). Thus, the Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.*

3. ISSUES

The issues related to the search in this case are inextricably intertwined and, if the Court finds any part of the officers' action were illegal and led to the seizure of the guns, the Court should suppress the guns and statements as "fruit of the poison tree." If the Court determines that the officers' initial entry into the building was illegal and led to the protective sweep, then the Court may hold that the drug paraphernalia found during the sweep is fruit of the poison tree and, thus, did not provide an adequate basis on which to detain Jayson Edwards and further search the building. Similarly, if the Court determines that the officers' protective sweep of the building was unreasonable, then the resulting search and seizure must be deemed illegal, and the guns and statement suppressed. Finally, if the Court determines that the officers performed the search and seizure without Edwards' consent or exceeded the scope to which Edwards consented, then the Court must suppress the evidence.

Because these issues are so interrelated, the Court finds the wiser course to address each separately, in chronological order as the events to

which they relate occurred: first, the issues related to the initial entry; second, the issue related to the protective sweep; and, third, the issues related to the officers' search and seizure of the challenged evidence.

More specifically, the Court will address the issues as follows:

(1) Issues related to the initial entry:

   (a) Did exigent circumstances exist that would justify the officers' warrantless entry of the building?

   (b) If exigent circumstances did not exist, did the warrantless entry result in an unwarranted search?

(2) Issue related to the protective sweep: Was it unreasonable for the officers to conduct a protective sweep?

(3) Issues related to the search and seizure:

   (a) Was Jayson Edwards' consent to allow the officers to search the building involuntary?

   (b) If Edwards' consent was voluntary, did the officers' search extend beyond the scope to which he consented?

4. DISCUSSION

   4.1 Initial Entry

      4.1.1 Exigent Circumstances

The officers broke the glass on the side door and entered the building without a warrant—an action that is presumptively unreasonable and illegal under the Fourth Amendment. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).

Though presumptively unreasonable, such warrantless entries are permissible when "exigent circumstances" exist. *Id.*; *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). To justify a warrantless entry, though, the government must prove that such exigent circumstances existed. *United States v. Patino*, 830 F.2d 1413, 1415 (7th Cir. 1987) (citing *United States v. Dowell*, 724 F.2d 599,

602 (7th Cir. 1984)). Further, the government must show that the law enforcement officers' belief that exigent circumstances were present was reasonable under an objective standard. *Patino*, 724 F.2d at 1415 (citing *Dowell*, 724 F.2d at 602).

Exigent circumstances exist when "there is a compelling need for official action and no time to secure a warrant." *Tyler*, 436 U.S. at 509. The Court must analyze the facts "from the perspective of the officers at the scene." *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir. 1995). Courts have found exigent circumstances to exist in situations where law enforcement officials reasonably perceived: (1) a danger to themselves or the public; (2) a suspect's likely escape; or (3) imminent destruction of evidence or property. *See United States v. Pichany*, 687 F.2d 204, 209 (7th Cir. 1982).

The magistrate found that exigent circumstances existed here because he concluded that it was reasonable for the officers to conclude that a burglary was in progress. (Mag. Rec. 6).

The Court disagrees, and finds that the warrantless entry in this case was not justified by exigent circumstances. First, the Court finds that exigent circumstances simply did not exist. In *Patino*, the Seventh Circuit held that exigent circumstances did not exist where an officer waited thirty minutes for backup to arrive. 830 F.2d at 1416. In particular, the *Patino* court was concerned with the officer's failure to telephonically seek a warrant during that thirty minute wait. *Id.* Additionally, the *Patino* court noted that the officers could have secured the exits to prevent escape while awaiting a warrant. *Id.*

Here, similar to the important facts in *Patino*, Officer Dorn substantially delayed entry of the building without seeking a search warrant—demonstrating a lack of exigent circumstances. He twice called for

backup and also arranged to contact the keyholders of the building prior to entering the building. Though the precise amount of time this took is unclear, nonetheless it is clear that there was ample time for Dorn to seek a search warrant, which he never did. The officers could have secured the exits to prevent escape if they were truly concerned with a burglary, but they did not do so. Therefore, this Court finds that the facts amply demonstrate that there were not exigent circumstances prior to the officers' initial entry.

Second, even if there were exigent circumstances, the Court finds that the officers could not reasonably have believed that a burglary was in progress. It is true that Edwards was a suspect in a string of burglaries and was seen by Dorn exiting and re-entering the building, but this Court finds that other circumstances should have reasonably put the officers on notice that a burglary was not in progress. In fact, less than two days prior to the events in question, the police department had held a briefing at which they discussed Edwards as a suspect. During that briefing, the police noted that Edwards was at least a "possible" renter of the building at 211 North Main Street. Of course, it was that very building that the police now claim they suspected Edwards of burglarizing.

This Court finds it highly suspect, and certainly unreasonable, that Dorn and Zywicki both failed to remember that Edwards was a renter of the building. Additionally, it is unreasonable that none of the officers sought to examine the briefing materials and discover that fact when Dorn noted that he suspected Edwards to be in the building. Finally, it is unreasonable that the officers would have arranged to call the keyholders of the building, but failed to identify Edwards as one of those keyholders and make an attempt to contact him.

Thus, the court finds that the officers could not have reasonably believed that a burglary was in progress. A person cannot burglarize himself; and, because the police were unreasonable in failing to identify Edwards as a renter of the building, the police were unreasonable in concluding that a burglary was in progress. At the evidentiary hearing on this matter, Officer Dorn even stated that he understood the definition of burglary, believed that Edwards was "possibly" renting out the building, and yet still did not feel compelled to attempt to make contact with him to determine whether he was lawfully renting the building and thus not burglarizing it. (Tr. 47–48).

For both reasons set forth above—the potential lack of exigent circumstances and the officers' unreasonable conclusions—the Court finds that the warrantless entry was not justified by exigent circumstances. Therefore, the initial entry was illegal.

### 4.1.2 Causation

Though the initial entry was illegal, the Court should not suppress all the evidence that the officers later found unless the initial entry caused the officers to place Edwards in custody. That is, the Court should not suppress the guns if they were not actually "fruit of the poison tree." Here, it was only after the officers placed Edwards in custody that they performed the protective sweep, found drug paraphernalia, questioned Edwards, and obtained permission to perform a further search that resulted in them finding the guns at issue. Thus, the illegality of the initial entry should matter only if it actually caused the officers to place Edwards in custody.

Under the facts of the case, though, it seems that the initial entry did not cause the officers to place Edwards in custody. In fact, after the officers broke the window and entered the building, the occupants of the building were seen moving towards the doors to exit; whereupon, the officers exited

the building and waited for the occupants outside. When the occupants, including Edwards, exited the building, the officers placed them in custody.

From these facts, the Court concludes that the occupants exited the building on their own volition; thus, the illegal initial entry did not result in the defendant being placed in custody. Had the police entered the building to take the occupants into custody, the entry would have caused Edwards to be placed in custody. But, here, the occupants voluntarily began to leave the building, and were placed in custody outdoors; therefore, the Court concludes that the initial entry did not cause the custody and does not require suppression of the evidence.

Edwards argues that the shattering of the door's glass caused him to exit the building. On the state of the facts that were established at the evidentiary hearing, though, the Court cannot say with certainty that this was the case.

Therefore, the Court agrees with the magistrate's recommendation on the lack of causation, and will not suppress the evidence on the basis of the initial entry.

4.2     Protective Sweep

During their protective sweep, the officers located the drug paraphernalia that led to Edwards' further questioning and the eventual discovery of the guns Edwards seeks to suppress; therefore, if the protective sweep was illegal under the Fourth Amendment, the Court should suppress the evidence.

The Fourth Amendment permits protective sweeps when officers possess a "'reasonable belief based on specific and articulable facts'" that the area they swept "harbored an individual posing a danger to the officer[s] or others." *Maryland v. Buie*, 494 U.S. 325, 327 (quoting *Michigan v. Long*, 463

U.S. 1032, 1049–1050 (1983) (further internal quotations omitted)). More specifically, *Buie* allows protective sweeps of areas "immediately adjoining" the location of the arrest, when the officers reasonably conclude from "articulable facts and rational inferences that danger lurks in the area to be swept." *United States v. Robinson*, 775 F. Supp. 231, 234 (N.D. Ill. 1991).

In other words, the Court should find the search permissible if it was reasonable for the officers to conclude that danger existed in the area of the protective sweep. *United States v. Burrows*, 48 F.3d 1011, 1015 (7th Cir. 1995). The inquiry is very fact-specific. *Id.*, at 1016. The Court should consider the configuration of the dwelling, the characteristics of those present or who might be present, and the general surroundings. *Id.*

Here, the Court finds that the surrounding facts permitted a reasonable conclusion by the officers that danger existed. Though the officers placed four men in custody, it was unclear whether any remained in the building. The officers did not see the men's entrance into the building, and thus they could not have known whether people remained inside. Additionally, given the fact that most of the building's windows were covered, the officers would not have been able to see if additional activity was occurring inside of the building. The same fact would have made it difficult for the officers to assess the configuration of the dwelling. Finally, it was clear that both Edwards and Shaw were present in the building. Given that both were suspects for criminal activity related to the sale of drugs and burglary of guns, the officers were justified in their concern for danger. For these reasons, the Court finds that the officers acted reasonably in performing a protective sweep.

Because the protective sweep was reasonable, the officers' discovery of the drugs was also reasonable. Thus, the officers' further questioning of

Edwards—during which time he consented to a search—was proper. Therefore, the Court will accept the magistrate's recommendation on this matter, and will not suppress the evidence on the basis of the protective sweep.

### 4.3 Search and Seizure

The final issues relate to Edwards' consent to Sergeant Zywicki's request to search the building. If Edwards' consent was involuntary, the Court must suppress the guns that the officers found during their search. *See Mincey v. Arizona*, 437 U.S. 385, 390 (1978). Additionally, even if Edwards consented to the search, the guns should be suppressed if the search exceeded the scope of Edwards consent. *Id.*

#### 4.3.1 Involuntary Consent

The Court must look to the "totality of the circumstances" in determining whether Edwards' consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The Court can consider factors such as Edwards' age, education, and length of detention, as well as the repeated nature of the officers' questioning of him, whether officers advised him of his rights, and whether he was subject to physical punishments. *Id.*

Here, the Court finds that Edwards' consent was voluntary. He was 34 years old at the time of this incident, with a high school education, having earned his GED. The length of his detention was also fairly short—approximately thirty to forty minutes. Though he spent a portion of this time outside in the cold, Edwards made the choice to do so due to his fear of a panic attack. Additionally, at the time he gave consent, Edwards had been moved back inside. There is no indication that the officers engaged in repeated attempts to secure Edwards' voluntary consent, although the officers never advised him of his rights. Finally, Edwards was not subject to

Edwards—during which time he consented to a search—was proper. Therefore, the Court will accept the magistrate's recommendation on this matter, and will not suppress the evidence on the basis of the protective sweep.

### 4.3 Search and Seizure

The final issues relate to Edwards' consent to Sergeant Zywicki's request to search the building. If Edwards' consent was involuntary, the Court must suppress the guns that the officers found during their search. *See Mincey v. Arizona*, 437 U.S. 385, 390 (1978). Additionally, even if Edwards consented to the search, the guns should be suppressed if the search exceeded the scope of Edwards consent. *Id.*

#### 4.3.1 Involuntary Consent

The Court must look to the "totality of the circumstances" in determining whether Edwards' consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The Court can consider factors such as Edwards' age, education, and length of detention, as well as the repeated nature of the officers' questioning of him, whether officers advised him of his rights, and whether he was subject to physical punishments. *Id.*

Here, the Court finds that Edwards' consent was voluntary. He was 34 years old at the time of this incident, with a high school education, having earned his GED. The length of his detention was also fairly short—approximately thirty to forty minutes. Though he spent a portion of this time outside in the cold, Edwards made the choice to do so due to his fear of a panic attack. Additionally, at the time he gave consent, Edwards had been moved back inside. There is no indication that the officers engaged in repeated attempts to secure Edwards' voluntary consent, although the officers never advised him of his rights. Finally, Edwards was not subject to

any physical punishments. His hands were placed in cuffs in front of him, minimizing any discomfort; any other physical discomfort, from the cold or from his bleeding finger, were due to Edwards' own actions.

On the whole, the Court must agree with the magistrate that Edwards freely gave his consent. Therefore, the Court will not suppress the evidence on the basis of involuntary consent.

### 4.3.2 Scope of Consent

Finally, the Court turns to the issue of whether the officers' search exceeded Edwards' consent.

The "scope of consent is 'limited by the breadth of actual consent,'" and whether the search remained within those limits is a question of fact. *Michael C. v. Gresbach*, 526 F.3d 1008, 1015 (7th Cir. 2008) (quoting *United States v. Long*, 425 F.3d 482, 486 (7th Cir. 2005)); *see also United States v. Torres*, 32 F.3d 225, 230–31 (7th Cir. 1994). The Supreme Court has stated that "the scope of a search is generally defined by its expressed object." *Florida v. Jimeno*, 500 United States 248, 251 (1991). More specifically, the Seventh Circuit has noted that general consent cannot be implied when other circumstances demonstrate that consent should be construed more specifically. *See, e.g.*, *United States v. Breit*, 429 F.3d 725 (7th Cir. 2005) (citing *United States v. Lemmons*, 282 F.3d 920, 924 (7th Cir. 2002)). Thus, the Court must look to the totality of the circumstances in determining the scope of consent. *Long*, 425 F.3d at 486 (citing *United States v. Raney*, 342 F.3d 551, 556 (7th Cir. 2003), *Torres*, 32 F.3d at 230–31). The Seventh Circuit has stated that another way to determine the scope of consent is to answer the question: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Raney*, 342 F.3d at 556.

In several cases similar to this one, the Seventh Circuit has held that evidence should be suppressed when it resulted from a search that went beyond the consent provided. *See, e.g.*, *Gresbach*, 526 F.3d 1008, *Dichiarinte*, 445 F.2d 126. In *Gresbach*, a social worker requested that a principal allow the social worker to "see the children" to investigate a child abuse allegation, but never specifically requested to search the children's bodies for injuries. *Gresbach*, 526 F.3d at 1015–16. The principal granted consent, allowing the social worker to "see the children." *Id.*, at 1016. During the social worker's meeting with the children, the social worker inspected the children's bodies. *Id.*, at 1012. In a civil suit against the social worker, the Seventh Circuit found that the principal's consent had not been "general consent," but was limited to what a reasonable person would believe he or she was consenting to. *Id.*, at 1015. The Seventh Circuit stated that a reasonable person would not have interpreted a request to "see the children" as a request to search the children's bodies. *Id.*, at 1015–1016. Therefore, the court held that the social worker's search exceeded the consent granted and was unreasonable under the Fourth Amendment. *Id.*, at 1016.

In *Dichiarinte*, the court held that a defendant's consent to allow officers to search for narcotics was limited, and did not allow the officers to search for and read the defendant's personal papers. *Dichiarinte*, 445 F.2d at 128–130. In that case, the defendant told officers that, "I have never seen narcotics. You guys come over to the house and look, you are welcome to." *Id.*, at 128. The defendant made another statement that would indicate he offered to allow the officers to search his house for narcotics. *Id.* However, when the officers searched the defendant's house, they recovered some financial papers over the defendant's protests; those papers were used to convict the defendant of tax offenses. *Id.* Defending their search, the officers

argued that the defendant had granted general consent to search his house. *Id.* The Seventh Circuit disagreed, holding that "Government agents may not obtain consent to search on the representation that they intend to look only for certain specified items and subsequently use that consent as a license to conduct a general exploratory search." *Id.*, at 129, 130–31.

Similar to the consent in the cases noted above, the totality of the facts demonstrates that the scope of Edwards' consent was limited, and that the officers exceeded that scope when they located the evidence Edwards now seeks to suppress. Taking the situation as a whole, the Court finds that Sergeant Zywicki's actions misled Edwards, and resulted in Edwards providing a very limited consent. Prior to seeking Edwards' consent, Zywicki discussed Edwards' ability to post bail and whether any electrical devices needed to be turned off. Edwards told Zywicki that a tattoo gun and space heater needed to be turned off. Afterwards, Zywicki asked whether there was "anything else" the police "needed to know about." This question clearly implies an interest in learning whether other appliances or electronics needed to be turned off in case Edwards was unable to post bail quickly and return to the building. The question does not imply an interest in finding evidence of further criminal activity. Thus, immediately afterwards, when Edwards consented to Zywicki—who asked to "check around" or "look around," but *never* asked to "search" the building—his consent was extremely limited.

At the most, Edwards may have thought that Zywicki would search the building's visible spaces. Prior to his discussion of the electronics that were on in the building, Zywicki talked with Edwards about the drug paraphernalia the officers had found during their protective sweep of the building. Thus, Edwards was primed to understand that the officers had

located drug paraphernalia that had been left out in visible spaces. And given Zywicki's casual request to "look around," Edwards was reasonable to believe that his consent would allow the officers to—at most—"walk through and see if there's any other drug paraphernalia items sitting out on the countertops." (Tr. 112).

As in *Gresbach*, the scope of Edward's consent should be limited by the context and wording of the officer's request to search. In *Gresbach*, the Seventh Circuit held that a reasonable person would not interpret a request to "see the children" as a request to search the children's body for signs of abuse. Similarly, here, a reasonable person would not interpret Zywicki's words, in the context in which they were asked, to be a request for general consent to search the entire building. As noted above, Zywicki never asked to "search" the building, but only to "look around." Further, that request came on the heels of Zywicki's extensive discussion of whether electronics were left on in the building. In such a situation, and considering Zywicki's language, Edwards reasonably assumed that the police would only make a cursory look around the building to turn off any appliances, perhaps examining open spaces like counter tops for more illegal paraphernalia. In such a search, there would be absolutely no reason for the officers to search above the ceiling tiles. And, though Edwards did not object to the search of such areas after they had begun, the Court finds that a reasonable person would similarly be unlikely to interject during police activity for fear of drawing further suspicion. Edwards certainly did not do what he should have done in this situation, which would be to either refuse the search or object when it began. But, the Court finds that his actions were the same as what a reasonable person would have done given Zywicki's questions—and

it is Zywicki's actions that ultimately turn this Court to the conclusion that the officers' search exceeded Edwards' consent.

Sergeant Zywicki seems to have obscured his request to search the building with an intentionally misleading preamble about bail and turning off appliances. Moreover, Zywicki's requests were couched in a "casual" conversation, leading Edwards to believe that only a cursory "look" around would take place. (Tr. 96–97). To be sure, it is improper for law enforcement officers to actively encourage a person's belief that a search is being called for on a limited ground and then to take that person's consent to an extreme. In cases like these, once the consent has been given following the limiting preamble, the officer may not extend the search beyond the scope of the individual's consent relying on the fact that the person affected will not object to the search for fear of drawing further suspicion.

For these reasons, similar to the Seventh Circuit's holding in *Gresbach*, Edwards offered only limited consent to search, given the context and language of Zywicki's request for consent. 526 F.3d at 1015–16.

The Court also finds that the scope of the officers' search exceeded Edwards' limited consent and, therefore, was illegal. Law enforcement officers may not obtain general consent to search based on a representation that they intended only a limited search. *Dichiarinte*, 445 F.2d at 129. Because Edwards' consent was obtained based on Zywicki's implied representations that only a limited search would occur, the Court finds that Edwards' consent was limited and not general. Thus, when the officers performed a general search of the building, including looking above the ceiling tiles, they exceeded the scope to which Edwards had consented. As such, the officers' search constitutes a clear violation of the Fourth Amendment.

Therefore, the Court must take exception to the magistrate's recommendations and will suppress both guns, as well as any statements that resulted from the seizure of those guns.

5. CONCLUSION

In this case, the officers pushed–and ultimately exceeded–the limits of acceptable evidence-gathering techniques. As earlier noted, the officers took actions inconsistent with their later exigent circumstances argument that would justify their initial entry. In fact, the Court might well have suppressed all evidence on that fact alone, if only Edwards and his fellow occupants had been arrested inside, rather than after choosing to exit the building. Sergeant Zywicki obscured the extent to which he planned to search the building by mischaracterizing his request which effectively limited the scope to which Edwards could consent. Therefore, the Court is obliged to grant Edwards' motion to suppress the guns and any statements made as a result of their seizure.

Accordingly,

IT IS ORDERED that Defendant's Motion to Suppress Physical Evidence and Statements (Docket #16) be and the same is hereby GRANTED.

Dated at Milwaukee, Wisconsin, this 31st day of October, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge